IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIMITRIOUS STOKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 13-2057-GMS |
| | ) | |
| ROCKFORD CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

### I.  INTRODUCTION

The plaintiff, Dimitrious Stokes ("Stokes"), who proceeds *pro se* and has been granted leave to proceed without prepayment of fees, filed this lawsuit alleging employment discrimination by reason of disability.[1]  Before the court is a motion for summary judgment filed by the defendants Rockford Center ("Rockford") and Molly Johnson ("Johnson").  (D.I. 74.)  For the reasons that follow, the court will grant the motion.

### II.  PROCEDURAL AND FACTUAL BACKGROUND

Stokes alleges that his employment was terminated and that the defendants made numerous attempts to discipline him "for mundane or non-existent reasons/behaviors", a handful of employees spread false rumors about him in public venues, and employees have contacted employers he worked for subsequent to his dismissal from Rockford.  (D.I. 2.)  Stokes filed a charge of discrimination and received his notice of suit rights on September 26, 2013.  (*Id.*)

---

[1]The complaint states that it is brought pursuant to under Title VII of the Civil Rights Act of 1964.  Stokes alleges employment discrimination by reason of disability and, therefore, the claim falls under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112, *et seq.*

"Rockford Center is a 118-bed mental health facility located in Newark, Delaware," providing easy access to a full complement of inpatient and partial behavioral health programs for children and adolescents, adults, and older adults." *See* http://www.rockfordcenter.com (last visited May 11, 2016). On or near May 7, 2012, Stokes accepted an offer from Rockford for a recovery specialist position in the nursing department. (D.I. 75, ex. 1.) In accepting the position, Stokes signed an acknowledgment that he understood the May 7, 2012 letter was not an express or implied agreement of guaranteed employment for a specific period of time or number of hours. (*Id.* at ex. 3.) The acknowledgment also stated that Stokes' employment was "at-will," meaning that Rockford could terminate Stokes' employment at any time for any reason. (*Id.*)

The general purpose of a recovery specialist is "[t]o provide direct patient care to geriatrics, adults, adolescents and children with psychiatric disorders as well as dual-diagnosis patients to ensure the safety and well being of patients." (*Id.* at ex. 5.) The recovery specialist job description enumerates nineteen essential job duties. (*Id.*) Stokes signed an acknowledgment that, as a recovery specialist, his duties included those listed in the job description, as well as additional duties assigned to him. (*Id.* at ex. 6.) The position was "PRN[2] with a nine-shift per month commitment and a mandatory three-weekend shifts on an as-needed basis. (D.I. 75 ex. 1, ex. 2 at 20.) Stokes testified that the position worked well for him because he was working multiple jobs, so the recovery specialist position allowed him "to schedule everything accordingly." (*Id.* at ex. 2 at 27.)

Stokes was advised that "all new employees are required to have a physical, PPD test, drug/alcohol screen, reference check, adult abuse, child abuse, and a criminal background check

---

[2]Meaning "when necessary."

2

before starting employment." (*Id.* at ex. 1.) When undergoing his physical examination, Stokes completed a "Physical Form," stating that he did not suffer from any mental or nervous disorders. (*Id.* at ex. 4.)

As part of his orientation process, Stokes received an employee handbook and Rockford's policy and procedures which included Rockford's attendance and termination policies. (*Id.* at exs. 7, 8.) The attendance policy requires all employees to notify their immediate supervisor or designee at least two hours prior their shift if they are unable to work a scheduled shift or if they know they will be late for work. (*Id.* at ex. 8, ¶ III.1.) An unreported absence for two consecutively scheduled work shifts will be considered a resignation without notice. (*Id.* at ¶ II, 5.)

In July of 2012, Stokes was assigned to work one-on-one with a male child who "had sexually deviant behaviors," and was known for violently attacking other children at any given time. (D.I. 75, ex. 2 at 65.) At the end of his shift, Stokes was asked to work an extra five hours, but he declined because he had other plans. (*Id.* at 65-66.) Stokes told Rockford that he would see what he could do until someone who could fulfill his role took his place. (*Id.* at 66.) At the end of Stokes' shift, a female PRN was sent to replace him. (*Id.*) Stokes testified that "it's explicitly stated in [Rockford's] policy that females can't do one-to-ones with males. (*Id.*) Apparently the patient attacked and injured the female PRN. (*Id.* at 69.) Stokes testified that everyone blamed him for the attack on the female PRN. (*Id.*) He testified that co-workers who worked during his shift would know that the female PRN had been injured by the child and that anyone who worked with the female PRN while she was recovering from her injury could find out about the incident through ordinary conversation. (*Id.* at 132.)

3

Following the incident, Stokes received a text message from Addie Lane ("Lane"),
originally sent from Rockford employee Michael Dunlap ("Dunlap"), regarding the incident. (*Id.*
at 115-116, 128.) The text message stated that Stokes had left the female PRN alone in a bad
situation, that she was hurt in a bad way, and that the author of the text did not want to see
Stokes' face again or he would do to him ten times worse that what the patient did to the female
PRN. (*See* D.I. 75, ex. 13.) Stokes does not have any other text message examples regarding the
incident. (*Id.* at ex. 2 at 135.)

Stokes testified that he usually hangs out at a restaurant in Newark, Delaware, called
Home Grown. (*Id.* at 136.) Other Rockford employees also frequented the restaurant, including
Johnson and Dunlap. (*Id.* at 137.) Stokes testified that does not know Johnson personally, but he
testified that he worked with her at least once. (*Id.* at 140, 144.) According to Stokes, he only
spoke to Johnson once during his employment with Rockford when they exchanged pleasantries
at Home Grown in June 2012, although he saw her a number of times at the restaurant with a
variety of Rockford employees. (*Id.* at 140-143.) On one occasion, Stokes saw Johnson speak to
Rockford manager Grant. (*Id.* at 143.) Stokes overheard a number of things at Home Grown
including that Johnson told another person that he "left a girl with a rapist." (*Id.* at 143.) Stokes
testified that Johnson "probably" said a variety of things, including what was in the text. (*Id.*)
Stokes did not approach Johnson, and he did not personally overhear any other allegedly
defamatory statements. (*Id.* at 144, 159.)

Stokes arrived late to work a few times in November, but not in December. (*Id.* at ex. 2
at 92.) The November latenesses were document as no-shows. (*Id.*) Stokes was scheduled to
work shifts on January 7, 2013 and January 11, 2013. (*Id.* at 42.) He was late for both shifts.

4

(*Id*. at 92.) Stokes testified that he was running late, called in on both days to tell someone, and was told by the shift manager not to come in. (*Id.* at 73-74.) To the best of Stokes' knowledge, he told Rockford he could still come in and was told, "don't come in." (*Id*. at 74.) He did not make prior arrangements to be off on those shifts. (*Id*. at 75.) Stokes was aware he was supposed to contact his employer prior to his shift to notify them if he needed to call off. (*Id*. at 75.)

Stokes' answers to the defendants' interrogatories state that he suffered from acute psychological and emotional distress caused by Rockford's work environment, and the issues stemming from his employment with Rockford persisted long after his employment had ended. (*Id*. at ex. 10 at Ans. 6.) Stokes does not have a mental health diagnosis, and he was not seen by a designated health care provider. (*Id*. at ex. 11.) Instead, Stokes had sessions with a counselor, beginning in January 2013. (*Id*.) The counselor offered one-hour sessions to help Stokes manage his interpersonal emotional issues brought on by the strain of his employment with Rockford. (*Id*.) The counselor reported that Stokes has significant trust issues that coincide with his harboring feelings of being misunderstood and victimized by others. (*Id*.) Stokes testified that he developed the disability during the course of his employment with Rockford, that he believes it "may have hindered [his] performance, but he did not "entertain this idea until October [2012] when [he] was receiving complaints from patients." (*Id*. at ex. 2 at 76.) When Stokes was asked if he approached anyone on the Rockford staff about his possible disability, Stokes responded that he was called into the office to discuss the disdain patients developed for him. (*Id*. at 77.)

Stokes testified that in January 2013, he sought an accommodation when he noticed that his disability started affecting his ability to show up to work. (*Id.* at 91.) He explained that he started calling in more frequently to let Rockford know that he would be late. (*Id.*) He asked that his "latenesses . . . be treated accordingly, just as latenesses." (*Id.* at 92.) On January 18, 2013, Stokes resigned his position following his two consecutive unexcused and/or unreported absences in derogation of Rockford's attendance and punctuality policy. (*Id.* at exs. 8, 12.)

Stokes has been employed in various positions subsequent to his employment at Rockford. He worked part-time for Mercedes-Benz, but limited his employment due to distance between his residence and the facility in West Chester. (*Id.* at 104.) He had a temp-to-hire position at Prince Telecom in February of 2013 as a contractor installing cable. (*Id.* at 105-06.) Stokes sought full-time employment there, but he did not pass an exam to become a full time employee. (*Id.* at 106.) Stokes worked seasonally at Amazon from November 13, 2013 to December 25, 2013. (*Id.* at 102.) Stokes testified that someone named "Jade" went to his employers at Amazon to discuss his conduct at Rockford Center, he "assum[ed] she's telling them things that aren't kind, probably telling them things" relating to an incident at Rockford Center. (*Id.* at 167-68.) Stokes also applied for a lab technician position at DuPont. (*Id.* at 112.)

## III.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "could affect the outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v.*

· 6

*Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. *Id.*  Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.*  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  With respect to summary judgment in a discrimination case, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987).

## IV.    DISCUSSION

### A.    ADA

Stokes alleges that he was forced to resign his position at Rockford because his shift manager told him not to appear for work on two consecutive occasions after Stokes informed her of his imminent lateness.  Stokes states that he sought an accommodation due to hardship in and out of work, but his pleas and requests were ignored.  The defendants move for summary

7

judgment on the grounds that there is no evidence that Rockford discriminated against Stokes due to a disability.

The ADA prohibits employment discrimination against "a qualified individual on the basis of disability" with regard to "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, disability means, with respect to an individual: (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). "Major life activities include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835 (3d Cir. 2015) (unpublished); 42 U.S.C. § 12102(2)(a). Whether an individual is substantially limited in performing a major life activity is a question of fact. *See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 763 (3d Cir. 2004).

### 1.    Reasonable Accommodation

The burden is on Stokes to establish that he is a qualified person with a disability, Rockford was aware of the disability, and Rockford failed to provide a reasonable accommodation. *See Kanofsky v. University of Med. & Dentistry of New Jersey*, 50 F. App'x 546, 547 (3d Cir. 2002) (unpublished). As noted above, a mental condition can be a disability under the ADA. *See* 42 U.S.C. § 12102(2)(A).

The evidence of record does not support a finding that Stokes is a person with a disability under the ADA. At the time of his hire, Stokes filled out a form and marked "no" in the section

that asked whether he had, or ever had, a mental or nervous disorder. Stokes' testified that he suffered from work related stress, but admitted he was not diagnosed with any mental disorder and was not treated by a designated health care provider for a mental disorder. Nor did the counselor whom Stokes first saw in January 2013, make any mention of a mental disorder or mental stress in his "limited overview of contact" with Stokes. (D.I. 75, ex. 10.) In addition, Stokes did not testify to any substantial limitation in a major life activity. Stokes' employment with Rockford ended in mid-January 2013, and he testified that he had new employment with Prince Telecom in February 2013. In addition, his testimony indicates that during the relevant time-frame he was able to engage in social activities.

Further, there is no evidence of record that Stokes advised Rockford of any mental condition or that Rockford was aware of a mental condition. When Stokes sought what he called an "accommodation" he did so because his wished his lateness to be treated "just as lateness" (apparently as opposed to a no-show) without mention to any mental health issues or mental stress. At most, Stokes discussed that patients had developed a disdain for him. And, as noted, when hired, Stokes indicated that he did not have any mental health disorders. Finally, Stokes did not seek a "lateness" accommodation until after his two unexcused/unreported consecutive late arrivals at work in January 2013 in derogation of Rockford's policies. There is no evidence of record that Stokes sought an accommodation for disability due to mental stress.

The court finds that the evidence of record does not support a finding from which a reasonable jury could infer that Stokes has an impairment or, that even if he had an impairment, it substantially limits a major life activity to the extent needed to establish disability under the first prong for qualifying as "disabled" under the ADA. Nor does the evidence of record

9

demonstrate that Stokes has a record of disability within the meaning of the ADA or that
Rockford regarded Stokes as disabled so as to satisfy the second prong. Finally, the evidence of
record does not support a finding under the third prong that Stokes sought an accommodation
from Rockford for a disability due to a mental disorder or mental stress.

Given that Stokes has failed to establish a prima facie case of discrimination under the
ADA, the court will grant the defendants' motion for summary judgment.

### 2.    Discrimination

However, even had Stokes established a prima facie case of disability discrimination,
summary judgment is appropriate for the defendants. When analyzing discrimination claims
under the ADA, courts apply the burden-shifting framework as set forth in *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792 (1973). *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 555 (3d
Cir. 2009) (unpublished). Under *McDonnell Douglas*, the plaintiff bears the burden of
establishing a prima facie case of discrimination, the burden of production then shifts to
defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action,
and if the defendant meets its burden of production, the plaintiff must prove by a preponderance
of the evidence that the defendant's proffered reason was a pretext for discrimination.
*McDonnell Douglas*, 411 U.S. at 802.

Stokes alleges that he was terminated due to disability. The ADA prohibits an employer
"from discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C.
§ 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must
demonstrate that he is a disabled within the meaning of the ADA, that he is otherwise qualified
for the job, with or without reasonable accommodations, and that he was subjected to an adverse

decision as a result of discrimination. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006).

The court finds that the defendants have met their burden of demonstrating a legitimate non-discriminatory reason for Stokes' termination. The evidence of record is that Stokes' employment ended because he violated Rockford's attendance policy. Stokes was scheduled for work on January 7, 2013 and January 11, 2013, and he did make prior arrangements to be off on those shifts. Stokes concedes that he failed to timely appear at work on two consecutive days. Rockford's policies provide that "[a]n unreported absence for two consecutively scheduled work shifts will be considered a resignation without notice," and its rules provide for immediate termination of employment where there is an absence of two or more calendar days without being approved by the facility. (D.I. 75, ex. 8, 9.)

There is no admissible evidence of record from which a reasonable jury could conclude that Rockford terminated Stokes because of his disability rather than his failure to abide by its attendance policy. The defendants have articulated a legitimate non-discriminatory reason for Stokes' termination and, therefore, summary judgment is appropriate as to the disability discrimination claim.

### 3.    Pretext

Finally, there is no evidence of record that Rockford treated Stokes differently from a similarly situated employee who does not belong to the same protected class. Stokes proffered no evidence that employees without disabilities who violated Rockford's attendance policy were not terminated. In addition, the evidence of record does not demonstrate that Rockford had knowledge of Stokes' disability. *See Glass v. Armstrong Utilities*, 2014 WL 7015966, at * 7

11

(W.D. Pa. Dec. 11, 2014) ("It is axiomatic that an adverse employment decision cannot have been based on discriminatory animus if the decision-maker had no knowledge of the alleged disability."); *Straining v. AT&T Wireless Services, Inc.*, 144 F. App'x 229, 232 (3d Cir. 2005) (unpublished) (noting that the plaintiff must demonstrate that the employer knew of the disability). Hence, the court finds summary judgment appropriate.

### B.    Contact with Prospective Employers

Stokes alleges that Rockford employees contacted employers for whom he worked following his dismissal from Rockford. The defendants move for summary judgment on the grounds that Stokes relies upon bare assertions and suspicions to support his claim. Stokes argues that he identified Rockford employees who slandered him to his other employers.

The record reflects that Stokes has held a number of positions subsequent to his termination from Rockford. At his deposition, Stokes testified that during his seasonal employment at Amazon, he saw a Rockford employee, whom he believed was named "Jade," going to managers and pointing in his direction, so he assumed she was telling the managers unkind things, "probably telling them things." (D.I. 75, ex. 2 at 167-168.) Stokes' assumptions are insufficient to establish a genuine issue of fact that Rockford employees contacted any of Stokes' employers to damage him. *See Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001). The record supports only a finding that Stokes assumed that Jade and other Rockford employees contacted his employers, but the evidence proffered does not support this assumption. *See Pilgrim v. Trustees of Tufts Coll.*, 118 F.3d 864, 871 (1st Cir. 1997) (a plaintiff's "perception is not evidence" of employment discrimination, and, hence, "not enough to withstand summary judgment").

12

The evidence of record does not support a finding that Rockford employees contacted Stokes' employers or prospective employees and discussed his employment at Rockford. Therefore, the court will grant the defendants' motion for summary judgment on this issue.

### C.   Defamation

Stokes alleges that he was slandered and defamed by Johnson when she spread false rumors about him in public venues outside Rockford's workplace. The defendants move for summary judgment on the grounds that Stokes cannot prove that Johnson defamed him.

Defamation is "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held." *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978). Libel is written defamation and slander is spoken defamation. *Id.* at 970. Slander per se requires a showing of special damages unless the statement: (1) maligns one in a trade, business, or profession; (2) imputes a crime; (3) implies that one has a loathsome disease; or (4) imputes unchastity to a woman. *Id.* at 967. To establish a claim for defamation the plaintiff must plead: "(1) the defamatory character of the communication; (2) publication; (3) that the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Read v. Carpenter*, 1995 WL 945544, at *2 (Del. Super. 1995).

Delaware recognizes a qualified privilege of employers to make communications regarding the character, qualifications, or job performance of an employee or former employee to those who have a legitimate interest in such information. *See Burr v. Atlantic Aviation Co.*, 332 A.2d 154, 155 (1974), *rev'd on other grounds*, 348 A.2d 179 (Del. 1975). "The privilege will not be forfeited unless there is excessive publication, use of the occasion for a purpose not

13

embraced within the privilege, or by making a statement which the speaker knows is false."
*Bloss v. Kersner*, 2000 WL 303342, at *6 (Del. Super. 2000).

Stokes allege slander per se based upon alleged statements that may malign him in his profession as well as defamation based upon text messages regarding an incident that occurred at Rockford. Initially, the court observes that the evidence of record does not support a finding that Johnson had any involvement in a text message authored and forwarded by two non-defendants. To the extent Stokes seeks to hold Johnson responsible for the text message, the claim fails. Summary judgment is appropriate for the defendants as to this claim.

To support his slander per se claim, Stokes testified that he overheard Johnson tell another Rockford employee that Stokes "left a girl with a rapist." Stokes' testimony defeats his slander claim against Johnson. He testified that he worked with a male patient with sexually deviant behaviors, that although requested to work additional hours he declined and left at the end of his shift, that a female PRN co-worker was assigned to the patient that day, and she was attacked by the patient and injured. The evidence supports a finding that there was truth in the alleged statement. In addition, the claim fails based upon Delaware's qualified privilege. Stokes' testimony indicates the Johnson made the statement to a co-worker and it directly related to his behavior in the workplace and his ability to perform work duties. There is no evidence of record that statements were made to non-Rockford employees.

No reasonable jury could find for Stokes on the defamation claim. Therefore, the court will grant the defendants' motion for summary judgment.

14

## V. CONCLUSION

For the above reasons, the court will grant the defendants' motion for summary

judgment.[3]  (D.I. 74.)

An appropriate order will be issued.

UNITED STATES DISTRICT JUDGE

_June 13_ , 2016
Wilmington, Delaware

---

[3]Stokes raises other claims in his opposition to the motion for summary judgment that were not raised in his complaint.  The court does not consider these claims.  *See Bell v. City of Philadelphia*, 275 F .App'x 157, 160 (3d Cir. 2008) (unpublished) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").